IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

K.G., by and through her mother and
next friend CHRISTINE C.,

     Plaintiff,

v.                                                            CIV 12-1209 KBM/GBW

SANTA FE PUBLIC SCHOOL DISTRICT and
THE BOARD OF EDUCATION FOR THE SANTA
FE PUBLIC SCHOOL DISTRICT, and
FELICIA SENA and KIMBERLY SEYMOUR,
in their individual capacities,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' Motion for

Summary Judgment and Memorandum in Support (*Doc. 192*), filed April 21,

2014.   Having reviewed the motion, the memoranda and exhibits submitted by

the parties, and the relevant authorities, the Court finds that the motion is well-

taken in part and will be granted in part and denied in part.

## I.   INTRODUCTION

K.G. is a school-aged child who is physically disabled and particularly

susceptible to falls and fractures.   She seeks damages for two injuries sustained

at Cesar Chavez Elementary, the first a dislocated patella resulting from a fall

from playground equipment in October 2010 and the second a broken femur

resulting from a fall in the hallway at Cesar Chavez Elementary in February 2012

after being pushed by another student.   Additionally, Plaintiff seeks damages

from a "physical jolt" and emotional distress resulting from a bus collision in June 2011. Plaintiff asserts that while the first two injuries were the result of Defendants' deliberate indifference to K.G.'s need for reasonable accommodation of her disabilities, all three events were the result of Defendants' negligence.

## II. FACTUAL BACKGROUND

### A. <u>K.G.'s Medical Condition and History</u>

K.G. is a student currently enrolled at Cesar Chavez Elementary School in Santa Fe Public School District ("the District"). Def.'s Mot. for Partial Summ. J., Doc. 192 ("Def.'s MSJ"), at Undisputed Fact ("UF") ¶ 1. K.G. has dysgensis of the corpus callosum, which is a brain disorder attributed to the abnormal development of the corpus callosum. Def.'s MSJ, at UF ¶ 2. This disorder has resulted in developmental delays and poor balance and coordination. Def.'s MSJ, at UF ¶ 2; Pl.'s Resp. to Def.'s Mot. For Partial Summ. J., Doc. 212 ("Pl.'s Resp."), at Additional Fact ("AF") ¶ 35. According to Felicia Sena ("Principal Sena"), principal of Caesar Chavez Elementary, the District and school personnel have been aware since at least 2008 that K.G. has poor balance, poor gross motor skills, and developmental delays and that she requires "continuous supervision," including while toileting, in the cafeteria, on the playground, and while moving around the school premises. *Doc. 196,* Ex. A, at 274:8-20. Additionally, the District was aware that K.G. suffered serious falls at preschool, including a fall on the playground that resulted in a broken arm. *Doc. 196*, Ex. A, at 274:21-275:1.

K.G. had a preexisting condition of decreased calcium and bony demineralization in her bones, which manifested prior to any of the relevant injuries in this case.  Def.'s MSJ, at UF ¶ 30; Pl.'s MSJ, at ¶ 30.  K.G. was also born with patella alta, a disorder that increases an individual's tendency to partially or fully dislocate their knees.  Def.'s MSJ, at UF ¶ 27; Pl.'s Resp., at ¶ 27.  Indeed, on May 11, 2010, prior to any relevant injury at school, K.G.'s chief complaint to doctors was pain and popping in her knee.  Def.'s MSJ, at UF ¶ 28; Pl.'s Resp. at ¶ 28.  The medical records reflect that K.G. experienced some fear and/or reluctance to walk prior to October 14, 2010, because of the frequent dislocation or subluxation (i.e. partial dislocation) of her kneecaps.  Def.'s MSJ, Ex. K, at 63:1-8.  On August 26, 2010, two months before K.G. dislocated her patella at Cesar Chavez Elementary, she underwent a pediatric physical therapy evaluation at Christus St. Vincent Sports Medicine for dislocating kneecaps, gait disturbances, and falls.  Def.'s MSJ, at UF ¶ 29; Pl.'s Resp. at ¶ 29.  Nevertheless, K.G. continued to participate in ballet at age seven, including in and around May 2010.  Pl.'s Resp. at AF ¶ 45.

Kimberly Seymour ("Nurse Seymour") is a level 2 school nurse for Cesar Chavez Elementary.  Pl.'s Resp., at AF ¶ 96.  Nurse Seymour was aware at the time that she began working as Cesar Chavez's school nurse that K.G. had a diagnosis of dysgenesis of the corpus callosum, though she did not know some of the details of the condition.  Pl.'s Resp., Ex. 13, at 141:10-21; *see also* Pl.'s Resp., Ex. 14, at 40:1-11

**B. K.G.'s IEP**

When a student has an individualized education program ("IEP"), an IEP team and the student's parents hold regular meetings to discuss ways to accommodate the student.  Def.'s MSJ, Ex. B, at 288:22-25.  K.G. has had an IEP since she began pre-school at Nye Early Childhood Center and continues to have one at Cesar Chavez Elementary.  Def.'s MSJ, at UF ¶ 3.  Since the time K.G. began kindergarten at Cesar Chavez Elementary, Principal Sena considered her "medically fragile" based upon information in her IEP.  Pl.'s Resp. at AF ¶ 35.

K.G.'s IEP identified her medical diagnosis[1] and her need for continuous supervision.  Def.'s MSJ, at UF ¶ 7.  More specifically, the IEP noted that she had a "[d]iagnosis of partial agenesis of the corpus collosum, neuronal migration abnormality."  Pl.'s Resp., Ex. 2A.  It also explained that K.G. "has poor balance, walks on her toes & balls of her feet – she has frequent falls."  Pl.'s Resp., Ex. 2A, at 2.  It also indicated that K.G. needed "continuous supervision" and that she required assistance to move in and around the school.  Pl.'s Resp., Ex. 2A, at 2.

The IEP provided that K.G. did not require an individual health plan ("IHP").  Pl.'s Resp., Ex. 2A, at 2.  However, the IEP documents provided some explanation of the difficulties that K.G. experiences as a result of her medical condition, including in the areas of mobility, toileting, feeding, and orientation in space.  *See* Def.'s Reply, Ex. G, H, and I.  There is also a note in K.G.'s May 27,

---

[1] Plaintiff denies the portion of Defendants' Statement of Undisputed Material Fact 7 indicating that K.G.'s "medical needs" were identified in the IEP documents.  Pl's Resp. at ¶ 7.  The Court agrees with Plaintiff that the referenced evidence does not establish that the IEP documents identified K.G.'s medical needs.

2008 IEP, suggesting that K.G. may need a bone density test.  Def.'s Reply, Ex. I, at 3.   Yet the portion of K.G.'s IEP that contains significant health information is not an IHP.  Pl.'s Resp., Ex. 2, at 56:18-24; Ex. 2A at 2.  In fact, it was not until the summer of 2012, after K.G.'s due process hearing was settled, that the District first created an IHP for K.G.  Pl.'s Resp., at AF ¶ 61.

## C.  Attendance at IEP Meetings

Nurse Seymour did not know whether she was always considered part of K.G.'s IEP team.  Pl.'s Resp., Ex. 14, at 34:13-18.  Typically, principals and case managers are responsible for ensuring that the proper people attend IEP meetings and participate in IEP discussions.  Pl.'s Resp., Ex. 2, at 52:4-7.  Nurse Seymour always signed the IEP signature page when she attended an IEP meeting.  Pl.'s Resp., Ex. 14, at 33:16-25.  Her signature, however, does not appear on the IEP signature pages for K.G.'s IEP meetings at any time prior to her hallway injury in February 2012.  *See* Pl.'s Resp., Ex. 2A at 4, Ex. 2B at 5.  Nurse Seymour started attending K.G.'s IEP meetings in 2012 because someone with the District requested that she attend.  Pl.'s Resp., Ex. 14, at 35:7-36:3.

Tricia Elmer, the District's Special Education Director, testified that if the people on a student's IEP team include nurses, occupational therapists, and physical therapists, those people would all have information that would contribute to the plan.  Pl.'s Resp., Ex. 2, at 41:22-52:3.  Ms. Elmer acknowledged that if a nurse or therapist provided their input for an IEP in writing or verbally in advance of an IEP meeting, there would be no opportunity for team discussion or a discussion with the student's parents.  Pl.'s Resp., Ex. 2, at 58:23-59:4.  The

signature page to K.G.'s November 18, 2011 IEP indicates that the school nurse, the occupational therapist and the physical therapist were also absent from K.G.'s IEP meetings.  *See* Pl.'s Resp., Ex. 2B, at 5.

### D.  Determining Whether an IHP was Required

Ms. Elmer testified that there should have been a discussion at K.G.'s 2010 IEP meeting as to whether K.G. needed an IHP.  Pl.'s Resp., Ex. 2, at 56:9-13.  She assumed from the IEP documents that the team had such a discussion and ultimately determined that K.G. did not need an IHP.  Pl.'s Resp., Ex. 2, at 56:11-13.  According to Ms. Elmer, if the IEP team felt that there was a question as to whether an IHP was required, the discussion should have involved the school nurse.  Pl.'s Resp., Ex. 2, at 45:14-17.

Nurse Seymour did not know whether she was considered "the one who makes the decision" as to whether a student gets an IHP, but that her understanding is that it is "just governed by the law."  Pl.'s Resp., Ex. 13, at 35:11-20.  She acknowledged, though, that it was her responsibility to help the IEP team to decide whether special education students require an IHP.  Pl.'s Resp., Ex. 14, at 7:18-75:5.  She explained that the determination is based on "conditions, factors, including diagnosis."  Pl.'s Resp., Ex. 14, at 67:24-68:11. The IEP team decides whether a child designated as "other health impaired" due to difficulty with ambulation receives an IHP, and Nurse Seymour attends the IEP meeting if she is available.  Pl.'s Resp., at AF ¶ 100.  Nurse Seymour would never design an IHP for a child without a doctor's order already in place.  Pl.'s Resp., at AF ¶ 100.  She admitted that she did not know whether it was part of

the scope of professional responsibility as the school nurse to contact physicians

if she had a question as to whether there was a need for an IHP.  Pl.'s Resp., Ex.

14, at 68:12-16.

Typically, for new special education students or returning special

education students with a new or changing condition, Nurse Seymour reviews

medical records with the IEP teams and is involved in the process of determining

whether the student needs an IHP.  Def.'s Reply, Ex. C, at 108:3-11; 109-113:3.

While she usually reviews documents accompanying a student's diagnosis from

the doctor, she explained that she did not review the documents accompanying

K.G.'s diagnosis in 2009, because she was not yet employed as the school nurse

at Cesar Chavez Elementary.  Pl.'s Resp., Ex. 13, at 85:20-86:3.  She stated that

"[i]n inheriting a school from a prior nurse," she assumed that the school had the

necessary information for the students who had been diagnosed while in that

nurse's care.  Pl.'s Resp., Ex. 13, at 86:13-19.  She indicated that there was no

quality control process at the school to insure that there was not a knowledge

gap between the former school nurse and her own decision-making.  Pl.'s Resp.,

Ex. 13, at 86:20-25.

With respect to the decision of whether or not K.G. should receive an IHP,

Nurse Seymour testified that she would refer to a doctor's orders related to

diagnoses and would expect the orders to detail the severity and involvement of

the diagnosis.  Pl.'s Resp., Ex. 13, at 85:5-7.  Nurse Seymour did not know what,

short of doctor's orders, would trigger an inquiry by the school regarding

additional safety precautions for K.G. in navigating around the school.  Pl.'s

Resp., Ex. 13, at 85:8-19.   According to Nurse Seymour, the communication methods for addressing safety concerns over a child's navigation on school premises are "casual conversation," IHP, IEP, and Section 504 plans.  Pl.'s Resp., Ex. 13, at 46:1-17.

**E.  <u>Development and Management of IHPs</u>**

District procedures provide that the school nurse is responsible for developing and managing a student's health plan "[b]ecause they have the expertise."  Pl.'s Resp., Ex. 2, at 36:3-13.  When developing an IHP, Nurse Seymour reviews documentation from physicians concerning a student's medical condition, performs a nursing assessment of various aspects of the condition, and writes the IHP.  Pl.'s Resp., at AF ¶ 98.  But in the absence of a medical diagnosis, Nurse Seymour doesn't know what her role would be in developing an IHP.  Pl.'s Resp., at AF ¶ 98.

When managing an IHP, a school nurse is also responsible for training the members of school staff who work with the student.  Pl.'s Resp., Ex. 2, at 36:10-16.  However, Nurse Seymour testified that she does not distribute IHPs to staff members; instead, it is the special education teacher who distributes them to those responsible for working directly with the student.  Pl.'s Resp., Ex. 13, at 50:14-19, 51:3-11.  In fact, Nurse Seymour does not know where IEPs or IHPs are kept.  Pl.'s Resp., Ex. 13, at 50:14-25.

Prior to October 2010 Nurse Seymour does not recall any conversations with anyone at Cesar Chavez Elementary related to K.G.'s navigation of school premises.  Pl.'s Resp., Ex. 13, at 41:21-25.  She did, however, have

8

conversations with staff during the 2010-2011 school year in which she interpreted K.G.'s updated doctor's orders and therapy orders.  Pl.'s Resp., Ex. 13, at 41:8-20.  She does not recall, however, providing any training or memoranda to school staff instructing them in how to assist K.G. in navigating the school, except as part of a team under the guidance of the physical therapist. Pl.'s Resp., Ex. 13, at 42:1-19.

**F. Documentation of Medical Conditions**

If a parent describes a concern that sounds like it will require intervention or accommodation, Nurse Seymour will ask a parent to sign a release of information form so that she can pursue the documentation from a medical practitioner that will allow her to create an IHP or, in the case of a general education student, a 504 plan.  Pl.'s Resp., at AF ¶ 101.  If a parent were ignorant concerning his or her child's medical diagnosis and explicitly requested Nurse Seymour's assistance, she would serve as a liaison with medical providers.  Pl.'s Resp., at AF ¶ 101.  However, short of a life-threatening situation or medical neglect, Nurse Seymour does not believe she has any duty to reach out to a parent to see if he or she would like assistance in communicating with medical providers.  Pl.'s Resp., at AF ¶ 101.

According to Nurse Seymour, while it was not the parents' responsibility to create a school-based plan for their child, it is their responsibility to inform the school regarding their child's condition, changes in the condition, and to provide doctors' orders and pertinent documentation.  Pl.'s Resp., Ex. 14, at 23:18-24:14. Nurse Seymour testified that it was, for instance, the custodial parent or parents'

responsibility to provide discharge instructions to the school.  Pl.'s Resp., Ex. 14, at 21:19-24.

K.G.'s mother signed a consent for the mutual exchange of information form in November 2010.  *See* Pl.'s Resp., Ex. 14D.  While the form indicates that it was received on November 29, 2010, there is a note on the form indicating that it was not received by Nurse Seymour until February 3, 2012.  See Pl.'s Resp., Ex. 14D.  Nurse Seymour does not know where the signed form was located before she received it in 2012.  Pl.'s Resp., Ex. 14, at 49:21-23.  Because K.G.'s mother had signed a consent for mutual exchange of information, Nurse Seymour agreed that "in theory," she could have called K.G.'s care providers to discuss K.G.'s condition.  Pl.'s Resp., Ex. 14, at 27:9-22.  However, other than her contact with a medical social worker at Carrie Tingley during the fall of 2013, after K.G.'s playground and hallway injuries, Nurse Seymour was not otherwise in contact with K.G.'s medical providers.  Pl.'s Resp., Ex. 13, at 100:1-15.  She does not know why she did not coordinate the mutual exchange of information between the school and K.G.'s medical providers.  Pl.'s Resp., Ex. 14, at 41:9-19.  She admits, however, that it was part of her job function to coordinate the mutual exchange of information between medical providers and the school and that it is also part of the professional standard of care for her to do so.  Pl.'s Res., Ex. 14, at 51:20-52:3.

Nurse Seymour does not know whether any medical records were received by the school with the consent form that was signed by K.G.'s mother or whether a request was ever sent to medical providers for records.  Pl.'s Resp.,

Ex. 14, at 52:24-53:23.  K.G.'s health file contained medical records for K.G. following the consent form, but Nurse Seymour does not know how they were acquired or whether she used them for any purpose.  Pl.'s Resp., Ex. 14, at 56:17-57:5.  Nurse Seymour researched pediatric osteoporosis on the Internet and filed a print out of the information in K.G.'s health file; however she does not know whether she researched K.G.'s diagnosis of dysgenesis of the corpus callosum.  Pl.'s Resp., at AF ¶ 123.

## G.  Notice of K.G.'s Condition

Nurse Seymour first became aware that K.G. had bone and joint problems when K.G. dislocated her patella on the school playground in October 2010; however, she still was not aware at that time that K.G. had low bone density. Pl.'s Resp., Ex. 13, at 81:25-82:8.  Indeed, K.G. had not yet been diagnosed with low bone density.  Def.'s Reply, at ¶ 108.

Had Nurse Seymour known that K.G. had low bone density, it would have triggered the creation of an IHP, and she and the physical therapist would have provided training to staff.  Pl.'s Resp., Ex. 13, at 54:1-13.  When a child has low bone density it means that "they are prone to fractures, . . . [b]ecause the bones are not as strong and durable."  Pl.'s Resp., Ex. 13, at 62:7-14.  Nurse Seymour was not aware that K.G. had broken a wrist in kindergarten.  Pl.'s Resp., Ex. 13, at 62:18-21.  She indicated that if she were the only person "working on K.G.'s care," then it would make sense for her to be the one to investigate with medical providers whether K.G. had low bone density.  Pl.'s Resp., Ex. 13, at 62:7-66:1. However, according to Nurse Seymour, there was a team responsible for K.G.'s

care at school, and the lead physical therapist for the District had taken a leadership role.  Pl.'s Resp., Ex. 13, at 64:18-65:1.  The IEP team had "casual conversations" with those overseeing K.G., including the educational assistants, the case manager, and the teachers, regarding the suspicion that K.G. had low bone density.  Pl.'s Resp., Ex. 13, at 64:23-65:13.  Additionally, the issue of low bone density may have been discussed at an IEP meeting.  Pl.'s Resp., Ex. 13, at 65:2-13.  Yet, at the time of her deposition, Nurse Seymour testified that she had never provided formal training to K.G.'s educational assistants about low bone density.  Pl.'s Resp., Ex. 13, at 60:12-61:14.

New information about K.G.'s diagnosis of dysgenesis of the corpus callosum was generated when the findings of a neuropsychological evaluation were presented at an IEP meeting on November 26, 2012.  Pl.'s Resp., Ex. 13, at 76:2-77:10; Ex. 13A.  Until then, Nurse Seymour was unaware that K.G.'s diagnosis would bring with it highly distractible and impulsive behavior, very poor visual spatial skills, and muscle weakness.  Pl.'s Resp., Ex. 13, at 79:7-80:12.

Nurse Seymour was also unaware that K.G. was diagnosed with cerebral palsy until sometime in 2013.  Pl.'s Resp., Ex. 13, at 83:12-16.  She did not know whether this diagnosis would have made a difference as to the decision to not provide an IHP for K.G., and she explained that she would review the doctor's orders related to the diagnosis to determine if K.G. required accommodation at school.  Pl.'s Resp., Ex. 13, at 84:3-14.

**H.  Nurse Seymour's Role with General Education Students**

Nurse Seymour is the 504 coordinator for Cesar Chavez Elementary.  Pl.'s Resp. at AF ¶ 96.  This means that she is responsible for writing Section 504 plans for students in general education who need accommodation.  Pl.'s Resp., at AF ¶ 98.  According to Nurse Seymour's belief and practice, special education students are not eligible for 504 accommodations; instead their accommodations are outlined in their IHPs.  Pl.'s Resp., at ¶ 98.  Nurse Seymour explained that she is tasked with addressing 504 plans for general education students with health needs, while the special education department addresses the health care needs of special needs students in accordance with their IEPs.  Pl.'s Resp., at AF ¶ 98.

As 504 coordinator, Nurse Seymour will convene meetings to evaluate a general education student, his or her data, and the placement options.  Pl.'s Resp., Ex. 13, at 43:5-12.  If a child is 504 eligible, she will write the 504 accommodation plan and give copies to the parents, to all the teachers that the student comes into contact with, and to the administrator.  Pl.'s Resp., Ex. 13, at 43:13-21.

**I.  District Standards/Policies Applicable to Nurse Seymour**

In addition to making staff members aware of 504 plans, Pl.'s Resp., Ex. 13, at 50:9-13, it was also Nurse Seymour's responsibility as school nurse to screen for health factors in special needs children, check health records, confer with teachers regarding students with chronic health problems, contact parents if there is a health care need, follow up with parental authorization and doctors'

orders for specific actions, prepare IHPs, assess health status of students being evaluated for special education, and follow up with a written report.  Pl.'s Resp., Ex. 14, at 66:8-67:23.

Nurse Seymour identified two compilations of policies and/or guidelines for nursing services for the District, which describe processes for identifying students who are at risk for physical problems or injuries in navigating school property: the Santa Fe Public School Nurse's Manual ("the Orientation Materials") and the New Mexico School Health Manual ("the Manual").  Pl.'s Resp., Ex. 13, at 22:20-14.  She described the former as the school nurse orientation manual for the District and the latter as an electronic set of guidelines from various sources that districts *may* enact into protocols.  Pl.'s Resp., Ex. 13, at 23:10-24:20.

The Manual provides the standard of practice for Seymour as a school nurse employed by the District.  Pl.'s Resp., at AF ¶ 115.  However, she understood the Manual to merely contain "guidelines from various sources that districts can enact into protocols."  Def.'s Reply, Ex. C, at 23:10-24:20.  The Orientation Materials include a "Professional Responsibility . . . Checklist to Avoid Liability," which advises nurses that reading the "Standards of School Nursing Practice" will help them "prepare for legal entanglements."   Pl.'s Resp., Ex. 14A, at 3.  Nurse Seymour does not recall ever reading the "Standards of School Nurse Practice."  Pl.'s Resp., Ex. 14, at 15:3-20.

## J.  Supervision Provided to K.G.

The District promised K.G.'s mother, when K.G. began kindergarten, that she would have continuous one-on-one supervision by a licensed educational

assistant during the school day.[2]  Pl.'s Resp., Ex. 1, at ¶ 3.  While there is no evidence in the record that K.G. was left unsupervised while attending Cesar Chavez, other than for brief periods while she used the restroom when attended by a male assistant (Pl.'s Resp, Ex. 1, at ¶ 8), there were instances in which the person supervising K.G. was also supervising other students at the same time. Pl.'s Resp., at ¶ 8 & AF ¶ 72.

Anthony Garcia was a special education assistant for the District.  Pl.'s Resp., at AF ¶ 62.  He was assigned to K.G. at times during the 2010-2011 and 2011-2012 school years.  Pl.'s Resp., at AF ¶ 62.  He was first assigned to assist K.G. while she was in the lunchroom, and he "wasn't told anything about her," except that she was "low functioning."  Pl.'s Resp., Ex. 5, at 24:10-25:12.

It was "pretty obvious" to Mr. Garcia that K.G. had poor coordination, because "[w]hen she would walk, she would stagger."  Pl.'s Resp., Ex. 5, at 26:4-11.  He also observed that K.G. could not judge distances well.  Pl.'s Resp., Ex. 5, at 26:19-21.  Mr. Garcia considered K.G.'s inability to judge distances to be a safety hazard, (Pl.'s Resp., Ex. 5, at 27:5-6), and he noted that "[e]verybody was concerned" that she might get seriously injured at school, (Pl.'s Resp., Ex. 5, at 27:16-19).  When Mr. Garcia first started working as K.G.'s educational assistant, she would frequently fall face-forward and catch herself, but that instability had improved until the time of her injuries.  Pl.'s Resp., Ex. 5, at 63:16-25.

---

[2] This statement of fact is supported by the May 15, 2014 Affidavit of K.G.'s mother, Christine Catanach.  While the Court has disregarded other statements in this affidavit based upon contradictory deposition testimony by Ms. Catanach, Defendant does not direct the Court to any contradictory testimony on this point.  As a result, the Court will not disregard this portion of the affidavit.

Mr. Garcia believes that Nurse Seymour told him after K.G.'s first injury in October 2010 that K.G.'s bones were particularly fragile.  Pl.'s Resp., at ¶ 66. Additionally, Mr. Garcia testified that toward the beginning of his supervision of K.G., K.G.'s mother told the school "regularly" that K.G.'s bones were fragile. Pl.'s Resp., at AF ¶ 66.  However, Mr. Garcia did not receive any written documentation concerning the fragility of K.G.'s bones, (Pl.'s Resp., at AF ¶ 66), and he does not recall receiving any specific training or instructions about K.G. from Nurse Seymour, except that he believed he may have received written memoranda about K.G.'s condition after her injuries.  Pl.'s Resp., at AF ¶ 68.  Mr. Garcia testified that he was told that K.G. had an IHP but that he never received a copy of it.  Pl.'s Resp., at AF ¶ 67.

According to Mr. Garcia, during the 2007-2008 school year, K.G. was not receiving one-to-one supervision at lunch but that, instead, one educational assistant was assigned to two special education students during the lunch period.  Pl.'s Resp., Ex. A, at 20:15-22.  At the beginning of the 2010-2011 school year the principal and special education teachers told Mr. Garcia that it was district policy to discontinue one-to-one supervision of special education students.  Pl.'s Resp., Ex. 5, at 62:6-16.  During that same year, educational assistants for special education students were called to serve as substitute teachers in general education classrooms approximately two to three times per week.  Pl.'s Resp., Ex. 5, at 125:5-126:9.  Because the school was short-staffed during the 2010-2011 and the 2011-2012 school years, the educational aid assigned to K.G. changed frequently.  Pl.'s Resp., Ex. 5, at 60:13-16.  Nurse

Seymour had the authority to advise the principal that the supervision a particular student was receiving was inadequate.  Pl.'s Resp., Ex. 13, at 75:17-21.

Lisa Creecy also worked as an educational assistant for the District and supervised K.G. at times.  Pl.'s Resp., at AF ¶ 63.  She did not recall ever being provided training concerning the provision of continuous supervision to a special needs child.  Pl.'s Resp., at AF ¶ 63.  Like Mr. Garcia, Ms. Creecy also observed that K.G. could not judge distances well.  Pl.'s Resp., Ex. 9, at 71:14-72:5.  She estimated that K.G. probably fell face-forward at least once per month.  Pl.'s Resp., Ex. 9, at 76:9-77:14.

The nature of continuous supervision that a student is to receive should be defined in their IEP.  Pl.'s Resp., Ex. 2, at 10:2-9; 26:20-27:3.  Most continuous supervision is "close proximity."  Pl.'s Resp., Ex. 2, at 33:1-3.  The principal, teacher, and school nurse at each school have the responsibility of ensuring that a special needs student has continuous supervision, including making sure that any substitute educational assistants have the information they need to supervise the special education student.  Pl.'s Resp., Ex. 2, at 42:1-43:13.  It is not acceptable to ignore the need for training for a substitute who was assigned to provide continuous supervision to a special education student.  Pl.'s Resp., Ex. 2, at 44:1-5.

## K.  Parent Communication with the School

In 2008, when K.G. started kindergarten, K.G.'s mother asked that a specific educational assistant be assigned to K.G.  Pl.'s Resp., Ex. 1, at ¶ 3. K.G.'s mother testified that before and during the 2010-2011 school year her in-

person communication with the school regarding K.G.'s care and education was limited to IEP meetings and parent-teacher conferences, which were scheduled by the school.[3]  Def.'s MSJ, Ex. A, at 39:11-22; 61:19-62:25.  Nurse Seymour had only one formal meeting with K.G.'s mother, after K.G.'s hallway injury in February 2012, to discuss K.G.'s needs and her reentry to school.  Pl.'s Resp., Ex. 13, at 98:14-24.

K.G.'s mother's primary method of communication with the District was to place notes and medical documentation in K.G.'s backpack.  Def.'s MSJ, Ex. A, at 76:4-18.  Additionally, she also communicated with the school via a notebook placed in K.G.'s backpack.  Def.'s MSJ, at UF ¶ 12.  The District responded to the requests made by K.G.'s mother in the notebook.  Def.'s MSJ. at ¶ 13.

Communication by K.G.'s mother about K.G.'s medical records and doctors' orders was "scant and not very forthcoming, very casual up until this lawsuit."  Def.'s Reply, Ex. C, at 137:3-9.  Different members of the IEP team had to "pursue her at times" to get information.  Def.'s Reply, Ex. C, at 137:9-11.  Staff members also sometimes found important medical information, including information containing changes to her ambulation and mobility status, "kind of stuffed in K.G.'s backpack without a call or a heads-up."  Def.'s Reply, Ex. C, at 137:11-14.  According to Nurse Seymour, she would only have knowledge of a medical diagnosis through the provision of a doctor's record or through

---

[3] Although K.G.'s mother stated in her May 15, 2014 affidavit that she had "frequent communications outside of IEP meetings with [the District] during the time KG has attended the schools," the Court disregards such testimony, finding that the affidavit attempts to create a sham fact issue as to the communication of K.G.'s mother with the District by contradicting sworn deposition testimony.  *Compare* Pl.'s Resp., Ex. 1, at ¶ 4 *with* Def.'s Ex. A, at 61:24-62:25; 115:12-25; *see also Burn v. Board of County Comm'rs of Jackson County*, 330 F.3d 1275 (10th Cir. 2003).

communication by the parent, which K.G.'s mother did not provide.  Def.'s Reply, Ex. C, at 138:10-25.

**L.  Playground Maintenance**

Principal Sena is evaluated on her management of the school campus, including the maintenance of the facilities and equipment, such as the school playgrounds.  Pl.'s Resp., at AF ¶ 49.  She has not been trained on how to conduct an inspection of playground equipment (Pl.'s Resp. at AF ¶ 50); however, the District did provide her with playground safety training, (Pl.'s Resp., Ex. 3, at 30:24-31:2).  The District's playground safety training focused on "all students" and Principal Sena could not recall whether any part of the training focused specifically on the safety of students with disabilities including mobility impairments.  Pl.'s Resp., Ex. 3, at 30:24-31:9.

Principal Sena does not inspect the playground or woodchips on a specific schedule, but she walks around at recess and observes the level of chips while the children are playing.  Pl.'s Resp., Ex. 3, at 107:20-108:4.  She is aware that the wood chips on the playground help to reduce the impact during the students' falls.  Pl.'s Resp. at AF ¶ 50.  She does not measure the level of the woodchips, but monitors them through visual inspection.  Pl.'s Resp., at AF ¶ 50.  She does not know the exact depth of woodchips that should be maintained.  Pl.'s Resp., Ex. 3, at 130:2-9.  When there are injuries that occur on the playground, Principal Sena checks the playground herself and puts in a work order to have the woodchip level checked.  Pl.'s Resp., Ex. 3, at 85:16-25.  Every school year, the District's General Services Department comes out to inspect the District's

playgrounds and will, at times, put in their own work orders for woodchips or equipment.  Def.'s MSJ, Ex. B, at 100:7-25.

There were no records of playground maintenance inspections between February 2009 and November 2010 or between November 2010 and September 2011.  Pl.'s Resp., Ex. 4, at 232:17-233:3.  The playground maintenance checklists from February 19, 2009, November 3, 2010, and September 28, 2011, documented concerns about the level of woodchips.  Pl.'s Resp., Ex. 4-A.  While there is documentation from various work orders for playground maintenance between February 2009 and November 2010, these work orders did not address the wood chips in the kindergarten playground.  *See* Def.'s Reply, at Ex. O.  The Cesar Chavez special education students that require continuous supervision use the kindergarten playground, which has smaller equipment, where they are supervised and separated from general education students.  Def.'s MSJ, at UF ¶ 21; Pl.'s Resp. at ¶ 21 & AF ¶ 48.

## M.  Playground Accident

Educational Assistant Anthony Garcia observed that K.G. "struggled to play on [the kindergarten] playground" because of her lack of balance.  Pl.'s Resp., Ex. 5, at 38:13-39:5.  He was concerned that K.G. might fall off of the equipment, and he regularly expressed his concerns to Nurse Seymour and the special education teachers.  Pl.'s Resp., Ex. 5, at 40:1-7.  Nurse Seymour did not go to the playground to observe how the special needs children were using the playground equipment, because she was not assigned to provide direct supervision to those students in their play area and did not believe that it was her

responsibility as the school nurse.  Pl.'s Resp., Ex. 13, at 131:12-21.  Educational

Assistant Lisa Creecy saw a need for K.G. and other special education students

to have extra supervision on the playground beginning in August 2010 because

of certain students in the special education class.  Pl.'s Resp., Ex. 9, at 48:8-16.

She was concerned that one particular special education student might run into

K.G. because of his "potential volatile behavior."  Pl.'s Resp., Ex. 9, at 46:11-16.

K.G. would, on occasion, exit the horizontal tube on the playground head

first and that if Mr. Garcia "wasn't there to catch her, she would end up on her

face."  Pl.'s Resp., Ex. 5, at 44:2-23.  Mr. Garcia explained that because of her

lack of coordination, she would try to stand up using one hand, with the other

hand still inside the tube.  Pl.'s Resp., Ex. 5, at 44:19-45:2.

On October 14, 2010, the day of K.G.'s playground injury, Ms. Creecy was

on the kindergarten playground supervising approximately four special education

students, including K.G.  Pl.'s Resp., Ex. 9, at 43:13-17; 52:19-21.  Although Ms.

Creecy testified that she believed that Mr. Garcia was on the playground

providing one-to-one supervision to another student, (Pl.'s Resp., Ex. 9, at 53:19-

22), Mr. Garcia testified that he was one "[h]undred percent sure" that he was not

on the playground when K.G. was injured, (Pl.'s Resp., Ex. 5, at 72:1-8).  Ms.

Lynch, the special education teacher, was also not on the playground at the time

of K.G.'s injury.  Pl.'s Resp., Ex. 3, at 69:15-18.

K.G. entered a horizontal crawling tunnel, which Ms. Creecy estimated

was a foot to a foot and a half high.  Pl.'s Resp., Ex. 9, at 50:16-20.  K.G.

emerged from the tunnel head first, twisting forward "in a contorted body

position." Pl.'s Resp., Ex. 9, at 56:15-57:8.  At first, Ms. Creecy watched K.G.

inch out and was not concerned that she would tumble out.  Pl.'s Resp., Ex. 9, at

58:7-9.  Ms. Creecy estimated that she was approximately three to four feet from

K.G. while she was in the tunnel but indicated that she moved toward her as she

saw K.G. having difficulty.  Pl.'s Resp., Ex. 9, at 58:10-59:7.  As K.G. was

"twisting out of the tunnel, she kind of fell onto the wood chips" and dislocated

her patella.  Pl.'s Resp., Ex. 9, at 57:3-5; UF at ¶ 37.  Principal Sena testified

that her expectation would have been that the person assigned to supervise K.G.

on the playground would be in close proximity to her.  Pl.'s Resp., Ex. 4, at

220:3-8.

Principal Sena followed post-incident quality control and safety policies

mandated by the District, including filling out an accident report, sending the

report to the Supervisor and the Risk Management office, and contacting K.G.'s

parent.  Def.'s MSJ, at UF ¶ 19; Pl.'s Resp. at ¶ 19.    Additionally, a school

safety committee, comprised of Principal Sena, Nurse Seymour, and a special

education teacher, inspected the kindergarten playground where the accident

occurred.  Pl.'s Resp., Ex. 3, at 56:13-57:8.  Principal Sena specifically checked

to see if the wood chips were sufficient.  Pl.'s Resp. at AF ¶ 52.  She determined,

based on her visual inspection, that the woodchips were not low.  Pl.'s Resp., Ex.

3, at 108:13-20.  However, consistent with her general practice when an injury

occurred on the playground, she also submitted a work order for the general

services department to check the wood chip level and noted that "[o]ne student

ha[d] been injured already."[4]  Pl.'s Resp., Ex. 3, at 108:24-109:16; Ex. 4, at 243:7-14; Ex. 4B.  The information about the injured child was included "[s]o we could get them out there to do our work order," or to identify the space where the wood chips were needed.  Pl.'s Resp., at AF ¶ 53.

After K.G.'s playground injury, Nurse Seymour was not concerned about the playground equipment itself, because "kids get injured every day on playground equipment."  Pl.'s Resp., Ex. 13, at 125:13-19.  She testified that she did not think that she had any responsibility as the school nurse to do anything more in terms of ensuring K.G.'s safety on the playground after K.G. was injured on the playground.  Pl.'s Resp., Ex. 13, at 127:8-19.  According to Nurse Seymour, both general education and special education kids are injured "routinely," even with appropriate supervision and playground equipment in working order.  Pl.'s Resp., Ex. 13, at 128:15-25.  To determine whether K.G. had been adequately supervised, Nurse Seymour "inquired, as per the accident report, as to who was in charge and had anyone witnessed the event."  Pl.'s Resp., Ex. 13, at 129:11-14.  She also considered whether any school rule had been violated, which she interpreted to mean whether the injured student was breaking a school rule.  Pl.'s Resp., Ex. 13, at 129:15-25.  She admitted that "it could be true" that a child could be injured on the playground because there was an insufficient safety plan in place to supervise the particular special needs child.  Pl.'s Resp., Ex. 13, at 128: 9-14.

---

[4] Plaintiff characterizes Principal Sena's submission of a work order as a contradiction to her testimony that she determined that the wood chips were not low.  Pl.'s Resp., at ¶ 53.  The Court agrees with Defendant that, considering Ms. Sena's testimony that she always submits a work order to check the wood chip level when a child is injured on the playground, the referenced testimony of Principal Sena is not necessarily contradictory.

If Ms. Elmer, the District's Special Education Director, knew that a special education student had an accident on the playground, she "would expect people to decide on a plan to provide the assistance that's needed for the student not to have an accident and to be safe."  Pl.'s Resp., Ex. 2, at 60:19-61:3.  Ms. Elmer did not recall being contacted regarding K.G.'s playground incident.  Pl.'s Resp., Ex. 2, at 61:4-16.

With the exception of Principal Sena, Nurse Seymour does not remember any specific conversations with staff at the school about how to ensure K.G.'s safety going forward after the playground incident.  Pl.'s Resp. Ex. 13, at 133:24-136:6.

**N.  School Bus Incident**

In June of 2011, K.G. was riding a school bus in her wheelchair when the bus allegedly hit a parked car.  Def.'s MSJ, at UF ¶ 14. According to K.G.'s mother, the bus caused significant damage to the car, which was parked at the house of K.G.'s aunt.  Pl.'s Resp., Ex. 1, at ¶ 17.  After the collision, the bus driver "turned around and took off with K.G. still on the bus."  Pl.'s Resp., Ex. 1, at ¶ 17.  K.G. did not incur physical injury[5] from the bus accident.  Def.'s MSJ, at UF ¶  14.  However, she was upset and scared when she got off the bus and was crying, "Please don't send my bus driver to jail."  Pl.'s Resp., Ex. 1, at ¶ 18.

---

[5] Although there is no dispute that K.G. did not incur physical injury, Plaintiff contends that the "reasonable inference from the facts" of the accident is that K.G. received a "physical jolt" when the bus hit the parked car and caused significant damage to the car. Pl.'s Resp. at ¶ 14.

**O.  Hallway Injury**

During the 2011-2012 school year, Gavin, another special needs child who attended Cesar Chavez, was in K.G.'s classroom.  Pl.'s Resp., Ex. 5, at 75:10-76:24; Ex. 9, at 111:25-112:1.  According to Anthony Garcia, Gavin "ran and pushed students on a regular basis, regular ed and special ed students."  Pl.'s Resp., Ex. 5, at 92:20-25.  Mr. Garcia defined "regular basis" as "[e]very day almost."  Pl.'s Resp., Ex. 5, at 92:24-25.  According to Mr. Garcia, Gavin did not always have an assistant with him, as the school was short-staffed, and he pushed students down more frequently when was without an assistant.  Pl.'s Resp., Ex. 5, at 93:8-10.  Mr. Garcia estimated that he saw over 10 incidents of Gavin knocking other students down and that he heard of "a lot more than that."  Pl.'s Resp., Ex. 5, at 93:11-16.  When asked whether there were as many as 50 incidents of Gavin knocking students down, Mr. Garcia responded that he "wouldn't say that high."  Pl.'s Resp., Ex. 5, at 93:21-24.  He noted, however, that "[i]t was enough to where [Gavin] was sent out of his classroom regularly and kept away from [recess] regularly."  Pl.'s Resp., Ex. 5, at 94:1-3.

Yvette Pedroni was assigned to supervise Gavin in the fall of 2011.  Pl.'s Resp., Ex. 10, at 18:20-25.  She was instructed to "shadow him" and told that he had Downs Syndrome and could not read or write but was not provided any specific information about his behavior.  Pl.'s Resp., Ex. 10, at 19:15-20; 24:14-25:7.  Ms. Pedroni was not shown any plan for Gavin's continuous supervision; nor did she receive training on continuous supervision.  Pl.'s Resp., Ex. 10, at 25:22-26:4.

Gavin would frequently run away from Ms. Pedroni when she was supervising him.  Pl.'s Resp., Ex. 10, at 32:3-25.  According to Ms. Creecy, Gavin would run to get away from adults "fairly frequently.  Probably once a day or every other day."  Pl.'s Resp., Ex. 9, at 102:15-22.  At the end of the day, Gavin would frequently run out the school door past the playground to the bus.  Pl.'s Resp., Ex. 10, at 46:21-47:11; 63:9-16.  Ms. Pedroni complained to the special education teacher, Mr. Simpkins, that she was having a hard time with Gavin, but Mr. Simpkins told her "you know, we just have to work with him, try to teach him." Pl.'s Resp., Ex. 10, at 33:10-16.  School staff would tell Gavin "you can't go running in the halls."  Pl.'s Resp., Ex. 10, at 38:2-7.

Near the beginning of 2012, a new student, Demonte, began attending Cesar Chavez Elementary.  Pl.'s Resp., Ex. 10, at 21:11-14.  Ms. Pedroni was assigned to Demonte, because Demonte's grandmother, also an educational assistant, could not supervise him.  Pl.'s Resp., Ex. 10, at 21:8-23.  Demonte's grandmother, Marie Arhontas, was assigned to Gavin.  Pl.'s Resp., Ex. 10, at 21:15-19.  In Ms. Pedroni's opinion, Gavin's behavior got worse when Ms. Arhontas became his assistant, because "she would just let him do whatever he wanted pretty much."  Pl.'s Resp., Ex. 10, at 43:20-44:8.

During the 2011-2012 school year, the school was short on assistants, lacking two assistants necessary for the special education students.  Pl.'s Resp., Ex. 3, at 90:15-21.  As a result, Cesar Chavez Elementary and Principal Sena relied upon substitutes to work as assistants for the special education students for parts of the school year.  Pl.'s Resp., Ex. 3, at 91:9-16-92:1-13.  The

assistants' student assignments also varied throughout the school day.  Pl.'s Resp., Ex. 3, at 90:18-21.  Principal Sena could not ensure that special education students with particular safety needs were not assigned substitutes.  Pl.'s Resp., Ex. 4, at 4-10.

Cesar Chavez Elementary dismissed special education students earlier than the general education students.  Def.'s MSJ, at UF ¶ 18.  The early dismissal helped to prevent injuries and behavior problems for the special education students, particularly the autistic children.  Pl.'s Resp., Ex. 5, at 83:5-15.  It was Mr. Garcia's impression that "everyone," including the educational assistants and special education teachers, was concerned that other special education students might run into K.G. in the hallway because of her unstable gait.  Pl.'s Resp., Ex. 5, at 87:20-88:2.

According to Ms. Lynch,  the educational assistants would always need specific instruction to keep an aggressive student away from a fragile student, "because of the intuition aspect of this."  Pl.'s Resp., Ex. 12, at 33:9-25.  She testified that in order for the educational assistants to have the necessary information about the students' needs, "[t]here should be a meeting with all the educational assistants" to review the individual students' needs.  Pl.'s Resp., Ex. 12, at 34:1-10.

At dismissal, the educational assistants would walk their assigned special education students to their buses or to their parents in the lobby.  Def.'s MSJ, Ex. H, at 45:19-46:12.  Special education teachers, on the other hand, were not typically involved in supervising the release of special education students at the

end of the day; instead, they were used to supervise the general education students at dismissal.  Pl.'s Resp., Ex. 10, at 83:22-85:1.  Accordingly, on the day of K.G.'s hallway injury, the special education teacher, Mr. Simpkins, had duties to help the general education students exit the school, leaving the educational assistants to assist K.G. and other special education students in exiting the school.  Pl.'s Resp., Ex. 3, at 122:13-123:1.

Ms. Pedroni testified that Ms. Arhontas was assigned to Gavin at the time of K.G.'s hallway injury.  Pl.'s Resp., Ex. 10, at 59:24-60:1.  Although Ms. Arhontas testified that she was "never assigned to a specific child," (Pl.'s Resp., Ex. 11, at 22:18-21), she also acknowledged that there were times when she was assigned to provide one-on-one support for Gavin, though she was never alone with him (Pl.'s Resp., Ex. 11, at 23:7-21).  Ms. Arhontas "wouldn't say it was continuous supervision," however, because she would work with other students if someone else was there.  Pl.'s Resp., Ex. 11, at 7-13.

On the day of K.G.'s hallway injury, an educational assistant brought Gavin into Mr. Simpkin's room, and Ms. Arhontas instructed the assistant to leave Gavin there and she would escort him to the bus.  Pl.'s Resp., Ex. 11, at 41:12-42:17.  At the time, Ms. Arhontas was working with one or two other students who were not "high-needs kids" on the computer, and she testified that there must have been another adult in the room.  Pl.'s Resp., Ex. 11, at 42:19-43:23.  At some point, Ms. Arhontas looked up and Gavin was gone, so she asked where he was.  Pl.'s Resp., Ex. 11, at 43:17-21.  She was told that the

educational assistant came back for him and walked him out.  Pl.'s Resp., Ex. 11, at 43:22-23.

In the meantime, Mr. Garcia was walking with K.G. to the bus.  Pl.'s Resp., Ex. 5, at 73:12-25.  Mr. Garcia let K.G. determine whether he would hold her hand, and on the day of the hallway incident, "she chose to run ahead" of him. Pl.'s Resp., Ex. 5, at 86:7-10.  K.G.'s special education teacher, Maria Lynch, did not instruct Mr. Garcia to hold K.G.'s hand when he escorted her to the bus.  Pl.'s Resp., Ex. 5, at 87:6-19.  According to Mr. Garcia, Gavin "blew by [him] and K.G. was far enough ahead of [him] to where [he] couldn't get to her and [Gavin] pushed her to the floor and ran through the door."  Pl.'s Resp., Ex. 5, at 73:25-74:4.  Mr. Garcia estimated that he was approximately three feet behind K.G. at the time she fell.  Pl.'s Resp., Ex. 5, at 79:18-23.  He testified that when Gavin hit K.G., she hit the floor hard and bounced up, crying.  Pl.'s Resp., Ex. 5, at 80:1-7. Only Mr. Garcia, K.G., and Gavin were in the hallway at the time.[6]  Pl.'s Resp., Ex. 5, at 81:3-4.  Mr. Garcia had to leave K.G. in the hallway briefly to run to the nurse's office.  Pl.'s Resp., Ex. 5, at 81:24-82:4.  Gavin's educational assistant told Mr. Garcia afterward that she was on the computer in the special education classroom when K.G. fell.  Pl.'s Resp., Ex. 5, at 81:5-20.

## P.  Medical Treatment Subsequent to K.G.'s School Injuries

After undergoing surgery on her patella following her playground injury, K.G. was instructed to participate in physical therapy, but her mother was not

---

[6] Although there is contrary testimony in the record, suggesting that Ms. Pedroni was also in the hallway and that Ms. Ahorntas was standing at the door of Mr. Simpkin's room, (see, e.g., Pl.'s Resp., Ex. 10, at 60:2-63:1; Ex. 3, at 118:10-19; 119:5-10), for purposes of Defendants' Motion for Summary Judgment, the Court views the evidence in the light most favorable to Plaintiff.

able to take her because of work.  Def.'s MSJ, Ex. K, at 21:10-15.  K.G.'s mother stated that after K.G.'s October 14, 2010 accident and knee surgery, she was not able to get K.G. to physical therapy until approximately November, at which time K.G. attended physical therapy twice a week for six or eight weeks.  Pl.'s MSJ, Ex. 1, at ¶ 24.  However, at an appointment on August 23, 2011, K.G. was reportedly in a wheelchair, refusing to walk, with minimal range of motion and having only been to physical therapy twice.  Def.'s MSJ, Ex. K, at 22:20-23:10

After her femur surgery following her hallway injury, K.G. and her mother cried when K.G.'s bandage was removed and they saw the stiches from her surgery.   Doc. 196, Ex. C, at 98:5-99:9.  Then, in late 2012 or early 2013, K.G. "just totally didn't want to walk."  Pl.'s Resp. at AF ¶ 42.  She started crawling in physical therapy at school and then refused to walk altogether.  Pl.'s Resp. at AF ¶ 42.  She "kept saying 'No, no, no.' She would go on the floor to crawl and she just didn't want to walk."  Pl.'s Resp. at AF ¶ 42.  K.G. was then re-hospitalized and underwent Botox surgery.  Pl.'s Resp. at AF ¶ 42.  Although medical professionals suggested that K.G. may be in the hospital for three months, her surgery and rehabilitation went so well that she was only in the hospital for three weeks.  Pl.'s Resp. at AF ¶ 42.

Some of K.G.'s medical providers have indicated that her issues with ambulation are psychological, have recommended that she consult with a psychologist, and have given her a low dose of valium.  Def.'s MSJ, at UF ¶ 23; Pl.'s Resp. at 43.  Dr. Grace, Plaintiff's orthopedic expert, opines that each injury and surgery that K.G. underwent left her with "a permanently atrophied leg and

probably some anxiety with regard to getting around that impedes her mobility."
Pl.'s Resp. at AF ¶ 44.  Dr. Grace also testified that the failure to participate in
physical therapy would delay recovery and could prevent a patient from regaining
the level of use they previously had.  Def.'s MSJ, Ex. K, at 21:10-22:25.

K.G. has broken her wrist, ankle, and femur at home on three separate
occasions.  Def.'s MSJ, at UF ¶ 24.  K.G. sustained a second fracture to her
femur on September 8, 2012, when she slipped on a coloring book at home.
Pl.'s Resp. at ¶ 41.  According to Dr. Grace, within a reasonable degree of
medical probability, the second fracture would not have occurred had K.G. not
experienced the first fracture at school on February 2, 2012.  Pl.'s Resp., at
AF ¶ 41.

## Q. Homebound Services

K.G.'s mother testified that approximately a month or a month and a half
after K.G.'s playground injury, Ms. Sena contacted her regarding homebound
services, indicating that she was looking for someone to provide such services
for K.G.[7]  Def.'s MSJ, Ex. A, at 68:18-70:3.  Principal Sena, on the other hand,
testified that she contacted K.G.'s mother the first week after the accident and
was told "let's wait" because K.G. had doctors' appointments for the first full week
after the accident.  Def.'s MSJ, Ex. B, at 160:13.  Ultimately, K.G. never received
homebound services after her October 14, 2010 injury, because it was "already
time for K.G." to return to school.  Def.'s MSJ, Ex. A, at 103:21-25.  According to

---

[7] Although K.G.'s mother indicated in her May 14, 2014 affidavit that at the time of K.G.'s
playground injury she did not know that K.G. could receive homebound services or what
homebound services were, (Pl.'s MSJ, Ex. 1, at ¶ 13), the Court will disregard such
testimony, as it directly contradicts her prior sworn deposition testimony.  See Def.'s
MSJ, Ex. A, at 68:18-70:3; see also Burn, 330 F.3d 1275.

Principal Sena, the District never assigned anyone to perform homebound services for K.G., because K.G.'s mother never provided the dates and times that she would like to have service.  Def.'s MSJ, Ex. B, at 160:6-13.

In 2013, after K.G. developed a contracture and required surgery, Angela Martinez of the District, coordinated with University of New Mexico Hospital to provide homebound services to K.G.; however, K.G. recovered quickly and was released from the hospital after three weeks.  Def.'s MSJ, Ex. A, at 120:15-121:21.

**R.  Purported Evidence of a Discriminatory Environment**

There were four or five occasions between October of 2010 and February of 2012, when some of the general education students "would grab [K.G.'s] walker and move it away from her."  Pl.'s Resp., Ex. 5, at 116:11-25.  Mr. Garcia told the general education teacher, but she told him that she had "other students to worry about."  Pl.'s Resp., Ex. 5, at 118:2-24.

Ms. Arhontas, a special education assistant at Caesar Chavez, testified that K.G.'s hallway injury "wasn't that big of a deal," because K.G. "would fall." Pl.'s Resp., at Ex. 11, at 48:18-23.  Ms. Arhontas went on to explain:  "of course, it was serious that K.G. broke a bone, but I know she's broken a bone since, and I know that she was fragile before, so it wasn't a – while it was a sad thing in general, she fell and was – she required – I guess that's why she had an EA with her."  Pl.'s Resp., Ex. 11, at 49:1-11.

K.G.'s special education teacher, Maria Lynch, testified that K.G. would frequently behave in a manipulative manner to get attention.  Pl.'s Resp., Ex. 12,

at 83:4-17.  She indicated that K.G. "wanted to have the attention of all the adults in the room," and that one way she would do this was to say, "Hi, Mrs. Lynch," in a loud, high voice.  Pl.'s Resp., Ex. 12, at 83:21-84:4.  Ms. Lynch assumed that K.G.'s behavior was affected by her medical diagnosis as well as her parenting and background.  Pl.'s Resp., Ex. 12, at 84:24-85:12.  Ms. Lynch characterized K.G. as "kind of whiney" and "petulant" if she did not get her way, occasionally throwing tantrums.  Pl.'s Resp., Ex. 12, at 118:13-18.  Ms. Lynch specifically recounted an occasion when K.G. "reach[ed] into the back of her pants and pull[ed] out a turd and put it on the ground next to her."  Pl.'s Resp., Ex. 12, at 118:20-24.  Ms. Lynch described Ms. Creecy, K.G.'s educational assistant, as "incredibly patient with the toileting issues,"[8] noting that it "was hard to always be as patient as [Ms. Creecy] was with her."  Pl.'s Resp., Ex. 12, at 119:1-6.

## III.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "genuine" dispute exists where the evidence is such that a reasonable jury could resolve the issue either way.  *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A mere scintilla of evidence in the non-movant's favor is not sufficient.  *Anderson*, 477 U.S. at 252.  However, the court must consider all the evidence in the light most favorable to

---

[8] According to Dr. Lorraine Freedle's "Overview of Key Neuropsychological Influences," delayed toilet training is a symptom associated with a diagnosis of agenesis of the corpus callosum.  Pl.'s Resp., Ex. 13A, at 2.

the party opposing summary judgment.  *See Trask v. Franco*, 446 F.3d 1036, 1043 (10th Cir. 2006).

Both the movant and the party opposing summary judgment are obligated to "cit[e] to particular parts of materials in the record" to support their factual positions. Fed. R. Civ. P. 56(c)(1)(A).  Alternatively, parties may "show[] that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B); *see also Medlock v. United Parcel Service, Inc.*, 608 F.3d 1185, 1189 (10th Cir. 2010) ("[I]f the matter in issue concerns an essential element of the nonmovant's claim, the moving party may satisfy the summary judgment standard 'by identifying a lack of evidence for the nonmovant on [that] element.'" (internal quotation and citation omitted) (alteration in original)). Materials cited to establish the presence or absence of a genuine dispute must be capable of being in a form that would be admissible in evidence.  Fed. R. Civ. P.  56(c)(2).

## IV.  ANALYSIS

### A.  Plaintiff's ADA and RA Claims

#### i.  Evidence of Intentional Discrimination

Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity."  42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act ("RA")

provides that "[no] otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794.  Notably, the Tenth Circuit has reasoned that "[b]ecause the language of disability used in the ADA mirrors that in the Rehabilitation Act," it therefore "look[s] to cases construing the Rehabilitation Act for guidance when faced with an ADA challenge . . . and vice versa."  *Cummings v. Norton*, 393 1186, 1190 n.9 (10th Cir. 2005).

In order to state a claim under the ADA or RA, Plaintiff must prove that:  1) K.G. is a qualified individual with a disability; 2) she was excluded from the benefits or services of a public entity or otherwise discriminated against by the public entity; and 3) such exclusion, denial of benefits, or discrimination was because of her disability.  *See Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999).  The parties do not dispute that K.G. was a qualified individual with a disability.  Instead, the inquiry before the Court on summary judgment is whether Plaintiff can establish that K.G. was excluded from participation in or denied the benefits of Defendants' services, programs, or activities, or otherwise discriminated against by reason of her disability.

Three theories of discrimination are available to Plaintiff:  1) intentional discrimination; 2) discriminatory impact; and 3) refusal to make a reasonable modification.  *Dawson v. Albuquerque Public Schools*, 03cv0345 JCH/LFG, Doc. 47 (D.N.M. Aug. 23, 2005); *Swenson v. Lincoln County School District No. 2*, 260 F. Supp. 2d 1136, 1144-45 (D. Wyo. 2003).  Plaintiff explains that she "relies on

both intentional discrimination and deliberate indifference to K.G.'s needs for reasonable accommodation, but the gravamen of Plaintiff's complaint is the denial of reasonable accommodation."  Pl.'s Resp., at 46.  The requirement that a public school make reasonable accommodations for disabled students finds support in the implementing regulations of the ADA, which provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate making the modifications would fundamentally alter the nature of the service program, or activity."  28 C.F.R. § 35.130(b)(7).  Moreover, the United States Supreme Court has recognized that Section 504 of the RA is intended to ensure that "an otherwise qualified handicapped individual [is] provided with meaningful access to the benefit that the grantee offers . . . . [T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made."  *Alexander v. Choate*, 469 U.S. 287, 301 (1985).  Thus, both the ADA and RA require public schools to make reasonable accommodations for disabled students.  *Barber ex rel. Barber v. Colorado*, 562 F.3d 1222, 1226 n.2 (10th Cir. 2009).

The Tenth Circuit has held that entitlement to compensatory damages under the RA requires proof that the defendant intentionally discriminated against the plaintiff.  *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999).   The court clarified, however, that intentional discrimination "can be inferred from a defendant's deliberate indifference to the strong likelihood that

pursuit of its questioned policies will likely result in a violation of federally protected rights." *Id.* The Tenth Circuit, along with a majority of circuits, has applied this deliberate indifference standard to reasonable accommodation claims under the ADA and RA. *See e.g., Barber*, 562 F.3d at 1229 (holding that the DMV did not act with deliberate indifference to the plaintiff's request for reasonable accommodation so as to warrant an award of compensatory damages); *see also Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009). The Tenth Circuit has relied particularly upon the deliberate indifference standard as articulated by the Ninth Circuit in *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) – that is, "[d]eliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that . . . likelihood." *Id.* The Tenth Circuit has explained that to satisfy the "failure to act" prong of the deliberate indifference standard, the failure must be the "result of conduct that is more than negligent, and involves an element of deliberateness." *Barber*, 562 F.3d. at 1229.

Here, Plaintiff may recover compensatory damages under the ADA and RA only if she can establish that Defendants were deliberately indifferent to K.G.'s need for reasonable accommodation or, put another way, that Defendants had knowledge that a harm to K.G.'s federally protected right was substantially likely but failed to act upon that likelihood.

Defendants maintain that they met all obligations to accommodate K.G.'s disabilities and that there is, therefore, no dispute of material fact as to whether

Defendants violated the ADA or RA.  More specifically, Defendants contend that K.G.'s detailed IEP documents addressed all of her needs, including her medical needs.  Defendants insist, for instance, that K.G.'s IEP recognized her physical limitations and provided guidance and instruction on transitioning her within the school setting.  Defendants submit that all of the information that Plaintiff contends should have been in K.G.'s IHP was covered in her IEP.  They argue that pursuant to K.G.'s IEP the District provided K.G. continuous supervision, which in turn provided her with meaningful access to the school and its programs.  In sum, it is Defendants' position that "[a] review of K.G.'s thorough and detailed IEP documentation clearly establishes that there is no dispute of material fact as to Plaintiff's RA and ADA claims".  Def.'s Reply at 41.

Plaintiff contends that the ADA and RA impose specific obligations on school districts to accommodate physically-disabled students, which go beyond the requirement of a free and appropriate public education pursuant to the IDEA. Plaintiff maintains that K.G.'s accident-proneness and susceptibility to injury, which were part of her medical diagnosis and obvious to those around her, necessitated the implementation of an IHP that provided more than boilerplate "continuous supervision" to K.G.

Plaintiff describes the level of accommodation that K.G. received pursuant to her IEP as follows:  "[t]he result of this boilerplate treatment of K.G.'s medical needs in the IEP's [sic] resulted in K.G.'s receiving only a minimal and often casual level of 'continuous supervision' – she was assigned to educational assistants who were told only that K.G. had cognitive impairments."  Pl.'s Resp.

at 49.  Plaintiff emphasizes that, despite concerns raised by Mr. Garcia and Ms.

Creecy, the educational assistants who supervised K.G. were not provided any

training or specific instruction with respect to K.G.'s physical fragility.  Doc. 212 at

50.

Plaintiff submits that K.G.'s IEP team required the guidance of the school

nurse, Nurse Seymour, who Plaintiff suggests abdicated her responsibility to

assess K.G.'s medical needs and exuded a "particularly cavalier" attitude.

Plaintiff contends that Nurse Seymour's participation in accommodating K.G. was

required by the District's orientation materials, the New Mexico School Health

Manual, and the school nursing standards promulgated by the National Nursing

Association.  According to Plaintiff, her lack of involvement left K.G.'s IEP team to

guess what K.G. might need in terms of reasonable accommodation.  Further,

Plaintiff insists that Nurse Seymour's approach – to wait until K.G.'s mother came

forward with a doctor's order mandating specific accommodation of K.G.'s

medical needs – is contrary to the ADA and RA, which require a public entity to

"consider the particular individual's need when conducting its investigation into

what accommodations are reasonable."  Pl.'s Resp., at 51 (citing *Barber*, 562

F.3d at 1229).

Plaintiff relies upon *Swenson v. Lincoln County School District No. 2,* 260

F. Supp. 2d 1136 (D. Wy. 2003), describing it as a case with a "similar set of

facts."  In *Swenson*, the District of Wyoming applied Tenth Circuit law and

concluded that the plaintiff raised a genuine issue of material fact as to whether

the school district intentionally discriminated against her because of her

disability[9] despite the school district's contention that it had merely committed "technical violations" of the ADA.  *Id.* at 1147.  Although the school district accommodated the plaintiff, who had cerebral palsy, by providing her a full-time physical aide, the court reasoned that this accommodation did not preclude an intentional discrimination claim.  *Id.* at 1143-44.  The court discussed evidence that demonstrated a "negative attitude towards ADA compliance" by the school district, including evidence that the district knew that its handicap parking signage was not ADA compliant and yet failed to bring it into compliance.  *Id.* at 1140. Additionally, it noted that the handicapped seating in the school's auditorium was not fully available for the plaintiff's use, as it was routinely filled with desks and chairs or videographers who were filming plays and concerts.  *Id.* at 1140, 1146.

Defendant maintains that, in contrast to *Swenson*, there is no evidence here of a technical violation of the ADA or RA much less a pervasive environment of ADA/RA noncompliance.  Defendants maintain that by creating a detailed IEP and providing continuous supervision to K.G., they fulfilled their obligations under the ADA and RA.  The Court cannot agree that providing these accommodations necessarily forecloses liability under the ADA and RA.

Plaintiff asserts that the "continuous supervision" that was provided to K.G. by the District was "remarkably reminiscent" of the "handicapped seating" provided to fair attendees in *Chaffin v. Kansas State Fair Bd.*, 348 F.3d 850 (10th Cir. 2003), *overruled on other grounds by Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 (10th Cir. 2012).  In *Chaffin*, the state fair's designation of a

---

[9] The *Swenson* case differs from the case at hand because the plaintiff there was not proceeding under a reasonable modification/accommodation theory.  *See Swenson*, 260 F. Supp. 2d at 1146.

seating area as "handicapped seating" was insufficient to negate a claim for disability discrimination, given that the seating area left disabled attendees trapped and unable to leave for food or to use the restroom, unable to view the stage, and subject to being climbed over, stepped on, and bumped by other attendees.  *Id.*  at  857.  As in *Chaffin*, Plaintiff asserts that Defendants cannot prevail on their motion for summary judgment by pointing to a mere promise to provide a particular accommodation, in this case of continuous supervision. According to Plaintiff, while the District clearly agreed to provide continuous supervision to K.G., the supervision actually provided was "minimal" and "casual" and not in accordance with a properly devised IHP.

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has presented sufficient evidence to create a genuine question of material fact as to whether, despite providing adult supervision to K.G., Defendants were nevertheless deliberately indifferent to the reasonable accommodation of K.G.'s medical needs.   While there is no dispute that K.G. was supervised by educational assistants while at Cesar Chavez Elementary pursuant to her IEP, the Court agrees that a question of fact exists as to the quality and extent of that supervision.  *See Chisolmn v. McManimon*, 275 F.3d 315, 327 (3d Cir. 2001) (concluding that the effectiveness of the auxiliary aids and services was a question of fact that precluded summary judgment).

Among the evidence supporting Plaintiff's ADA and RA claim is evidence that although the District promised K.G.'s mother that it would provide one-to-one, continuous supervision to K.G., there were times when the educational

assistants supervising K.G. were also supervising other students, including at the time of K.G.'s playground injury. Indeed, there is testimony in the record suggesting that the District made an affirmative decision to discontinue one-to-one supervision of special education students.

K.G.'s IEP did not define in specific terms the type of "continuous supervision" that she was to receive, and the educational assistants tasked with supervising her were not provided any training or instruction on how to effectively supervise her. Anthony Garcia, for instance, testified that he was not told anything about K.G., except that she was "low functioning." Evidence submitted by Plaintiffs suggests that the District's failure to train and instruct educational assistants as to K.G.'s particular needs was compounded by the use of substitutes in the special education classroom and by the lack of consistency in assistant-student assignments. Tricia Elmer, the District's Special Education Director, testified that the principal, teacher, and school nurse are responsible for ensuring that students who require continuous supervision receive such supervision from educational assistants with the necessary information and training to do so. Given K.G.'s serious medical condition, the failure to train her educational assistants about her condition and how to assist her in navigating the school could be construed by a reasonable jury as deliberate indifference.

Further, Nurse Seymour's lack of involvement in K.G.'s care and apparent apathy toward accommodating her medical needs constitute evidence of

deliberate indifference to K.G.'s need for reasonable accommodation.[10]  Although Nurse Seymour agreed that it was her responsibility to screen for health factors in special needs children, to check health records, to confer with teachers regarding students with chronic health problems, and to write IHPs, the evidence before the Court suggests that she provided very few, if any, of these services to K.G.  In contrast to Nurse Seymour's involvement with general education students requiring accommodations, for whom she convened meetings, evaluated data, considered placement options, and updated and instructed staff, she left the special education department to address the health care needs of special needs students in accordance with the students' IEPs.

While Nurse Seymour was aware that K.G. had a diagnosis of dysgenesis of the corpus callosum, a condition with which she was relatively unfamiliar, she made little to no effort to obtain medical documentation related to her condition or to otherwise evaluate the accommodations that K.G. required.  She did not, for instance, contact any medical providers to discuss whether an IHP or particular accommodations may be appropriate.  Further, although K.G.'s mother signed a release for medical records in November 2010, the evidence suggests that neither Nurse Seymour nor administrators made an effort to gather medical records or information to assist them in determining the proper accommodations for K.G.   While K.G.'s mother may not have always effectively communicated K.G.'s medical needs to the school, this does not absolve Defendants of their duty to provide reasonable accommodations to K.G.  Because the District was

---

[10] In suits brought under the ADA and RA, a public entity is vicariously liable for the acts of its employees.  *Duvall v. County of Kitsap*, 260 F.3d 1124 (9th Cir. 20014).

aware of K.G.'s diagnosis and because some aspects of her medical condition were readily observable and obvious, a reasonable jury could conclude that a duty arose to gather information necessary to determine the reasonable accommodations that she required. *See Barber v. Colorado Department of Revenue*, 562 F.3d 1222, (10th Cir. 2009) (citing Ninth Circuit case law for the proposition that "a public entity does not 'act' by proffering just any accommodation: it must consider the particular individual's need when conducting its investigation into what accommodations are reasonable").

When Nurse Seymour took over as school nurse at Cesar Chavez, she assumed that the school had the information necessary for K.G.'s care, and she admitted that there was no quality control process at the school to avoid a "knowledge gap" between a new school nurse and the former nurse. K.G.'s IEP provided that she did not require an IHP; however, Nurse Seymour was apparently not part of that conversation or decision, as she did not attend any of K.G.'s IEP meetings prior to K.G.'s hallway injury in February 2012. Along with Nurse Seymour, the occupational therapist and physical therapist were also absent from K.G.'s IEP meetings. According to Ms. Elmer, even if Nurse Seymour and the therapists provided input for K.G.'s IEP in writing or verbally in advance of the IEP meetings, their absence arguably foreclosed any opportunity for a meaningful team discussion.

According to Mr. Garcia, he regularly expressed concerns to Nurse Seymour and the special education teachers that K.G. might injure herself on the playground equipment; however, Nurse Seymour testified that she did not go to

the playground to observe the special education students on the equipment, because she did not consider it her responsibility. Even after K.G.'s playground injury, Nurse Seymour did not recall having conversations with staff about how to ensure K.G.'s safety on the playground going forward. She indicated that she was not concerned about the playground equipment because "kids get injured every day on the playground."

Evidence submitted by Plaintiff could also support a finding that the failure to provide effective supervision of K.G.'s fellow student, Gavin, put K.G.'s safety at risk and was indicative of a deliberate indifference toward accommodating K.G.. Prior to K.G.'s hallway injury, Gavin frequently ran away from his educational assistants and pushed both regular education and special education students, especially when he did not have an educational assistant with him. According to one of Gavin's former educational assistants, she was not provided any training on how to supervise Gavin. When she complained to the special education teacher that she was having a difficult time with Gavin, as he would frequently run from her, she was told, "we just have to work with him, try to teach him." There is also testimony that Gavin's behavior worsened when Ms. Arhontas began supervising him, because she "just let him do whatever he wanted pretty much." At the time Gavin pushed K.G. down in the hallway, Ms. Arhontas had offered to supervise Gavin but was instead working on the computer with other students when she realized Gavin was gone. Ms. Arhontas further testified that K.G.'s hallway injury "wasn't that big of a deal," because K.G. "would fall."

Plaintiff also presents evidence of considerable delay in offering homebound services to K.G. after her playground injury.  According to K.G.'s mother, Principal Sena did not contact her for a month or a month and a half to broach the topic of homebound services, and even then, she indicated that she was looking for someone to provide such services.  Ultimately, K.G. never received homebound services before returning to school.  Although there is contrary evidence, suggesting that the lack of homebound services was at least partially because of the unresponsiveness of K.G.'s mother, the evidence produced by Plaintiff provides additional support for a finding of deliberate indifference to providing reasonable accommodations to K.G.

Finally, Plaintiff has presented evidence, albeit sometimes subtle, suggesting that various teachers were apathetic toward K.G.'s medical condition and her need for accommodations.  For instance, when general education students would grab K.G.'s walker and move it away from her, a general education teacher told her K.G.'s assistant that she had "other students to worry about."  Ms. Arhontas testified that K.G.'s hallway injury in which she fractured her femur "wasn't that big of a deal," because K.G. "would fall."  Finally, K.G.'s special education teacher described K.G. as manipulative, attention-seeking, whiney, and petulant and noted that it was hard to be patient with her.

In light of the foregoing evidence, Plaintiff's claims under the RA and ADA based upon the failure to provide reasonable accommodation to K.G. survive summary judgment.  Because evidence produced by Plaintiff creates a genuine issue of material fact as to whether Defendants were deliberately indifferent to

K.G.'s need for reasonable accommodation, Plaintiff may assert a claim against Defendant for compensatory damages.

### ii.     Emotional Distress Damages

A separate but related matter involves the availability of compensatory damages for emotional distress under the ADA and RA.  The inquiry is not entirely straightforward, as the ADA and RA do not contain express provisions outlining the available remedies, and the Supreme Court has not decided the precise scope of available compensatory damages under the ADA and RA.

Defendants contend that the ADA and RA, as Spending Clause legislation, do not allow for emotional distress damages.  In support of their position, they rely principally upon Judge Browning's decision, in *Khan v. Albuquerque Public Schools*, 03cv0118 JB/RLP, Doc. 39 (D.N.M. Dec. 31, 2003), in which he held that emotional distress damages are not recoverable under the RA.  In *Khan*, Judge Browning considered the reach of the Supreme Court's decision in *Barnes v. Gorman*, 536 U.S. 181 (2002), concluding that the Court had determined that contract law principles guide the determination of available damages under Spending Clause legislation.  *See Khan*, 03cv0118, Doc. 39 at 8.

Defendants acknowledge that Judge Armijo of this District reached the opposite conclusion in *N.T. v. Espanola Public Schools*, 04cv0415 MCA/DJS, Doc. 55 (D.N.M. June 21, 2005).  Indeed, in *N.T.*, Judge Armijo reasoned as follows:

> [w]here there is proof of intentional discrimination or retaliation in the provision of public educational services that is actionable under the ADA or Section 504 of the Rehabilitation Act, I have no difficulty in concluding that the available remedies include damages for

specific and genuine instances of mental anguish or emotional distress caused by that discrimination or retaliation.

*Id.* at 27-28.  In sum, Judge Armijo reasoned that relevant provisions of the ADA and RA were more analogous to a contract for personal well-being, for which emotional distress damages are available, than to a commercial contract for which they are not.  *Id.* at 28-29.

This intra-district split has not been resolved, as neither the United States Supreme Court nor the Tenth Circuit has directly addressed the availability of emotional distress damages under the ADA and RA.  The Supreme Court has, however, taken up related issues, including the availability of compensatory damages under Title IX and the availability of punitive damages under ADA and RA.

In *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 75 (1992), the Supreme Court held that a "damages remedy" was available for a Title IX violation.  *Id.* at 75.  The Court rejected an argument that the general presumption in favor of allowing "all appropriate remedies" was inapplicable because Title IX was enacted pursuant to Congress' Spending Clause power.  *Id.* at 74.  The Court explained that remedies are only limited for Spending Clause legislation when the alleged violations are unintentional.  *Id.* at 74.

Thereafter, in *Barnes*, the Court considered the "scope of 'appropriate relief'" under Title VI, the ADA and the RA, determining that punitive damages were not recoverable under such legislation.  *Barnes*, 536 U.S. at 189.  The Court applied the contract law analogy – whereby the relationship between Congress and federal funding recipients is deemed essentially contractual – and

48

defined the scope of available damages under traditional contract law principles. *Id.* at 186-87. Justice Scalia, who authored the plurality opinion, stated in a footnote, however, "We do not imply . . . that suits under Spending Clause legislation are suits in contract, or that contract-law principles apply to all issues they raise." *Id.* at 188 n.2.

The Eleventh Circuit appears to be the only circuit court to squarely address the issue of emotional distress damages under the ADA or RA since *Barnes. See Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1190 (11th Cir. 2007). It held that non-economic compensatory damages are available under the RA for intentional discrimination. *Id.* at 1198. The court's rationale was threefold: first, that emotional distress is a foreseeable consequence of a funding recipient's breach of their "contract" with the federal government not to discriminate, giving them fair notice; second, that even applying contract law to the circumstances would render emotional distress damages recoverable; and third, that because permitting recovery of emotional distress damages would not contradict the nature of the RA as Spending Clause legislation or interfere with Congress's intent, the court was bound by the presumption that any available remedy is available. *Id.*

This Court finds the rationale of the Eleventh Circuit well-reasoned and persuasive, and joins it in holding that emotional distress damages are available for intentional violations of the ADA and RA. Particularly, this Court agrees with the proposition that emotional distress is a foreseeable consequence of a public school's intentional discrimination when it fails to provide reasonable

accommodation to a medically fragile student. Moreover, the Court's rationale in *Franklin* and in Justice Scalia's footnote counsel against a rigid contract law interpretation in favor of a flexible, somewhat tort-based approach to damages under the ADA and RA. Notably, though, even if the Court were constrained by traditional contract principles in defining the scope of damages here, one exception to the general preclusion of emotional distress damages in contract cases is when emotional injury is accompanied by bodily injury. *See* Restatement (Second) of Contracts, § 353, cmt. a; *see also Roberts v. Progressive Independence, Inc.*, 183 F.3d 1215 (10th Cir. 1999) (upholding a jury award for pain and suffering for a defendant's failure to accommodate in violation of the RA, where the plaintiff suffered both physical and emotional injury). Here, K.G. alleges that both physical and emotional damages resulted from Defendants' ADA and RA violations, making her eligible for emotional distress damages even under a contract law analysis.

### iii.  Competent Evidence of Damages

Although Plaintiff has produced sufficient evidence to create a triable issue as to a violation of the ADA and RA, a mere violation, even if proven at trial, does not necessarily entitle Plaintiff to damages. Rather, "[c]ompensatory damages for emotional distress must be supported by competent evidence of 'genuine injury.'" *See Foster v. Time Warner Entertainment Co.*, 250 F.3d 1189, 1196 (8th Cir. 2001). In this regard, Defendants assert that "Plaintiff's conclusory claim of emotional distress and mental anguish do not meet the threshold required to support a damage award." Def.'s MSJ at 29.

In fact, Defendants insist that Plaintiff's theory of damages is the one that was expressly rejected by the Supreme Court in *Carey v. Piphus*, 435 U.S. 247 (1978).  In *Carey*, a consolidated action against school districts for the violation of procedural due process rights, the Supreme Court reasoned that although emotional distress caused by the denial of procedural due process rights are compensable under § 1983, it would not presume damages, as "neither the likelihood of such injury nor the difficulty of proving [them was] so great as to justify awarding compensatory damages without proof that such injury actually was caused."  *Id.* at 264.  Accordingly, in the absence of proof of actual injury from the defendant's constitutional violation, the plaintiffs in *Carey* were only entitled to recover nominal damages.  *Id.* at 266.  Similarly, in *Brady v. Fort Bend County*, 145 F.3d 691, 718-19 (5th Cir. 1998), another case relied upon by Defendants, the court held that the plaintiffs' failure to establish with sufficient evidence actual injury in the form of emotional distress from the defendants' First Amendment violations meant that they could recover only nominal damages.  *Id.*

Plaintiff suggests that the application of *Carey* to Plaintiff's claims for K.G.'s lost enjoyment of life and pain and suffering is "difficult to discern."  Pl.'s Resp. at 58.  She insists that she is not seeking damages "for the value to K.G. of the denial per se of her right to be free of disability discrimination" but is instead seeking "traditional tort damages."  *Id.* at 58-59.  Indeed, it is Plaintiff's position that Defendant's deliberate indifference to K.G.'s need for reasonable accommodation of her disabilities led to her physical injuries *and* caused her emotional distress.

Under the circumstances, the Court agrees that the principles in *Carey* and other cases relied upon by Defendants do not preclude, for want of supporting evidence, a jury from awarding compensatory damages to Plaintiff. Here, unlike the plaintiffs in *Carey*, Plaintiff alleges and provides evidentiary support for *actual* damages.  Most notably, Plaintiff provides evidence that K.G. suffered from a dislocated patella from a fall on the playground on October 14, 2014, and a fractured femur from a fall in the hallway on February 2, 2012 .  She notes that K.G. incurred substantial medical costs and suffered great pain, both at the time of her injuries as well as during recovery.  She provides the opinion of Dr. Grace that K.G. is likely permanently physically impaired.  There is also evidence that K.G. missed school and that there was delay in offering her homebound services.  Psychologically speaking, Plaintiff provides evidence that K.G. has grown fearful of walking, has been referred to a psychologist, has been prescribed valium, and that she cried when she observed her stiches following her femur surgery.  The Court also finds that, although the evidence of a causal connection is not overwhelming, Plaintiff has sufficiently linked K.G.'s physical injuries to Defendants' purported discrimination for purposes of avoiding summary judgment.  Based on the record before the Court, and viewing the evidence in the light most favorable to Plaintiff, the Court finds sufficient evidence for a reasonable jury to award Plaintiff compensatory damages, including for emotional distress.

**iv.   Exhaustion of Administrative Remedies**

As the Court held in its May 17, 2013 Memorandum Opinion and Order on Defendants' Motion to Dismiss, Plaintiff adequately exhausted her remedies under the IDEA, as she was required to do, before filing suit under the ADA and RA. *Doc. 29* at 6. Under the ADA and RA, Plaintiff seeks compensatory and nominal damages, including damages that accrued after K.G.'s playground and hallway injuries, the last of which occurred in February of 2012, during the 2011-2012 school year. Defendants now contend that "[b]ecause claims alleged to have occurred during the 2012-2013 school year were not litigated at the administrative level, Plaintiff is not entitled to any relief under IDEA, Section 504, or ADA for claims related to that school year or beyond." Def.'s Reply at 48. As the Court reads Plaintiff's Complaint and briefing, she seeks damages, including for ongoing medical care, resulting from injuries that K.G. sustained during the 2010-2011 and 2011-2012 school years. Plaintiff does not, as Defendants allege, seek damages for new injuries or new statutory violations occurring in the the 2012-2013 school year. Thus, Defendants' argument with respect to exhaustion is not well-taken.

## B. Negligence Claims

In addition to her federal claims, Plaintiff also asserts negligence claims against Defendants under the New Mexico Tort Claims Act ("NMTCA"). The NMTCA limits the tort liability of governmental entities and public employees. *See Pemberton v. Cordova*, 734 P.2d 254, 255 (N.M. Ct. App. 1987). Section 41-4-4(A) of the NMTCA provides that governmental entities and public employees acting within their scope of duty "are granted immunity from liability

for any tort except as waived by Sections 41-4-5 through 41-4-12." NMSA § 41-4-4(A).

It is Plaintiff's burden to identify the specific statutory sections that waive immunity and to demonstrate that the facts alleged fit within one of the exceptions. *See Rubio v. Carlsbad Mun. Sch. Dist.*, 744 P.2d 919, 921 (N.M. Ct. App. 1987). With respect to K.G.'s injuries on the playground and in the hallway, Plaintiff alleges that tort immunity for these claims has been waived under NMSA § 41-4-6 for the negligent operation of a building. With respect to the June 2011 school bus collision, Plaintiff alleges that tort immunity for Plaintiff's claim has been waived under NMSA § 41-4-5 for the negligent operation of a vehicle.

### i. Hallway Injury

Asserting that there is waiver of immunity for K.G.'s hallway injury, Plaintiff posits that two critical opinions, *Encinias v. Whitener Law Firm*, 310 P.3d 611 (N.M. 2013) and this Court's May 17, 2013 Opinion on Defendants' Motion to Dismiss, "wholly reject" Defendants' argument to the contrary.

In *Encinias*, the New Mexico Supreme Court found a genuine issue of material fact as to whether a dangerous condition existed on school premises, such that the state's immunity for injury was waived under § 41-4-6. *Id.* at 619. There, the plaintiff was badly beaten by a classmate or classmates on a street that the high school cordoned off for use by its students. *Id.* at 614. The assistant principal made a statement that the area where the alleged attack occurred was a "hot zone" for student violence, which the court considered enough to "raise questions about the degree of student violence and the school's

efforts to discover and prevent student violence in that area." *Id.* at 619.  The court reasoned that "[w]hile one student's battery of another would not generally waive a school's immunity under Section 41-4-6(A), a school's failure to address a pattern of student violence in a particular area might create an unsafe condition on the premises." *Id.* at 618.

The court also noted in *Encinias* that New Mexico appellate courts have found a dangerous condition under § 41-4-6 to take many forms, including wild dogs roaming the grounds of a housing project,[11] a high volume of cars exiting a parking lot after a concert,[12] the operation of a municipal swimming pool with an inadequate number of lifeguards,[13] the congregation of prison gangs in a room shielded from observation by guards,[14] and the violation of students' IEPs and failure to follow proper emergency procedures.[15]  *Encinias*, 310 P.3d at 617. While the scope of § 41-4-6 is not boundless, *see, e.g., Espinoza v. Town of Taos*, 905 P.2d 718 (N.M. 1995) (holding that a summer camp's failure to supervise children at a playground did not waive immunity under § 41-4-6), its application is clearly broad.

In this Court's May 17, 2013 Opinion on Defendants' Motion to Dismiss, the Court held that Plaintiff's allegations fell within the waiver set forth in § 41-4-6, noting that the Complaint alleged that K.G.'s special health needs were well known to Defendants and the school was tasked with meeting those needs in order to provide a safe environment for her.  *Doc. 29* at 25.  In so holding, this

---

[11] *Castillo v. County of Santa Fe*, 755 P.3d 1259 (N.M. 1988).
[12] *Bober v. N.M. State Fair*, 808 P.2d 614 (N.M. 1991)
[13] *Leithead v. City of Santa Fe*, 940 P.2d 459 (N.M. Ct. App. 1997)
[14] *Callaway v. N.M. Dep't of Corr.,* 875 P.2d 393 (N.M. Ct. App. 1994)
[15] *Upton v. Clovis Mun. Sch. Dist.*, 141 P.3d 1259 (N.M. 2006).

Court found that the allegations presented were "more akin" to those in *Upton v. Clovis Mun. Sch. Dist.,* 141 P.3d 1259 (N.M. 2006) than those in *Encinias*.   At the time of the Court's decision, only the New Mexico Court of Appeals had considered *Encinias*, and it had determined that the plaintiff's claim, "although couched in terms of a failure to follow a safety policy, [was] solely a claim for negligent supervision."  *Id.* at 1249.  A claim for negligent supervision, of course, is not cognizable under § 41-4-6.    Interestingly, at oral argument on the Motion to Dismiss, Defense counsel argued that the facts in the present case were more akin to those in *Encinias* than those in *Upton*. See Doc. 29 at 25.  Now, with the benefit of the New Mexico Supreme Court's resolution of the claims in *Encinias*, it turns out that both cases support a waiver of immunity under § 41-4-6.

Plaintiff asserts that at the time of K.G.'s hallway injury, Defendants "did virtually nothing to ensure that Gavin . . . did not knock K.G. to the cement floor in the hallway at the end of the school day, despite advance knowledge of the fragility of K.G.'s bones and the frequently aggressive behavior of Gavin towards his fellow students."  Pl.'s Resp. at 38.  Although there is evidence to the contrary, Plaintiff has presented evidence, primarily the testimony of Anthony Garcia, suggesting that Defendants had knowledge both that K.G.'s bones were fragile and that Gavin was frequently aggressive toward fellow students, having previously knocked down students less than 50 but more than 10 times.  Further, there is evidence of record that at the end of the day Gavin would frequently run away from his educational assistant, out the school door, and past the playground to the bus.  Although one of Gavin's educational assistants

complained to the special education teacher about this behavior, she was apparently told "we just have to work with him, try to teach him."  Under such facts, the Court is satisfied that there is sufficient evidence of the school's failure to address a dangerous pattern of behavior by Gavin, particularly in relation to K.G. and any other students with mobility issues or susceptibility to injury, to create an unsafe condition on the premises.  Accordingly, there is a genuine issue of material fact as to Plaintiff's tort claim based upon K.G.'s hallway injury.

**ii.    Playground Injury**

With regard to K.G.'s playground injury, Plaintiff asserts that two theories of liability support a waiver of immunity under § 41-4-6.  First, Plaintiff argues that, pursuant to the rationale in *Upton*, Defendants failed to ensure that K.G. had an IHP to address her particular susceptibility to injury and to implement the supervision mandated by her IEP through training and supervision of education assistants assigned to her and other special needs students.  Second, Plaintiff asserts that there is a question of material fact as to whether Principal Sena and the District were negligent in maintaining the playground, which she claims is supported by the opinion of her expert Thom Thompson.  The Court agrees that the evidence produced by Plaintiff supports a waiver of immunity for purposes of K.G.'s playground injury under either theory.

First, the Court has already determined herein that there is a genuine issue of material fact as to whether Defendants were deliberately indifferent toward K.G.'s need for accommodations, given her particular medical needs. Under *Upton*, many of the facts supporting a finding of intentional discrimination

also support a waiver of immunity under § 41-4-6.     For instance, although the District promised K.G.'s mother that it would provide one-to-one, continuous supervision to K.G., there were times when those supervising K.G. were also supervising other students, including at the time of K.G.'s playground injury, when Ms. Creecy was supervising about four special education students. Indeed, there is testimony in the record suggesting that at some point the District made an affirmative decision to discontinue one-to-one supervision of special education students.  Further, K.G.'s IEP did not define in specific terms the type of "continuous supervision" that she was to receive, and the educational assistants tasked with supervising her were not provided any training or instruction on how to effectively supervise her on the playground or otherwise. Mr. Garcia regularly expressed concerns to Nurse Seymour and the special education teachers that K.G. might injure herself on the playground equipment; however, Nurse Seymour did not go to the playground to observe K.G. or other special education students on the equipment, because she did not consider it her responsibility.  Under *Upton*, the evidence presented by Plaintiff supports a waiver under § 41-4-6 based Defendants' failure to ensure that IHPs were in place for special education students like K.G. and that educational assistants were properly informed and trained with respect to those IHPs.

Second, at the time of K.G.'s playground injury, she fell off of a horizontal tunnel onto the wood chips, which at a proper depth are designed to reduce the impact of such falls.  The evidence before the Court suggests that Principal Sena did not inspect the playground woodchips on a specific schedule or with any

measuring device but merely visually inspected them at times while the children were playing at recess.  According to Principal Sena, she did not receive any training on the inspection of playground equipment, nor did she know the depth of woodchips that should be maintained.  Most significantly, Principal Sena testified that there were no records of playground maintenance inspections between February 2009 and November 2010.  Further, both the February 2009 and November 2010 inspections documented concerns about the level of woodchips, but none of the work orders between these dates requested wood chips in the kindergarten playground.  Finally, after K.G.'s playground injury, Principal Sena submitted a work order for the wood chip level to be checked, noting that "[o]ne student ha[d] been injured already."

While Plaintiff relies upon her expert's opinion that, at the time of K.G.'s playground injury, the district's failure to add or rake woodchips had allowed the surfacing to deteriorate to a "non-compliant, unsafe, level," this opinion is the subject of Defendants' Motion in Limine (Doc. 194), in which Defendants urge the Court to exclude Mr. Thompson's opinions as unreliable and inadmissible.  Because the Court concludes, given the broad application of § 41-4-6, that Plaintiff has created a genuine issue of material fact as to the negligent operation of a public building even without the testimony of Mr. Thompson, the Court need not resolve the issue of admissibility of Mr. Thompson's opinions in the context of Defendants' Motion for Summary Judgment.  Indeed, a reasonable jury could conclude based upon the testimony of Plaintiff Sena and the school's playground maintenance records that the school's lack of a regular maintenance schedule

and its failure to assess, add, or "fluff" wood chips on the kindergarten playground during the relevant time periods created an unsafe condition on school premises for which there is a waiver of immunity under § 41-4-6.

### iii. School Bus Accident

Finally, Plaintiff relies upon NMSA § 41-4-5 to support a waiver of immunity for Defendants' negligent operation of a vehicle, which she claims occurred when K.G.'s bus driver crashed into another vehicle and left the scene of the collision with K.G. still on the bus.  NMSA § 41-4-5 provides that

> The immunity granted pursuant to the New Mexico Tort Claims Act does not apply to liability for damages *resulting from bodily injury, wrongful death or property damage* caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any motor vehicle . . ."

NMSA § 41-4-5 (emphasis added).

Defendants insist that Plaintiff has not provided sufficient evidence of a bodily injury related to the bus accident and that emotional distress is not independently compensable.  Plaintiff, in contrast, asserts that the "physical jolt" to K.G. at the time of the bus collision qualifies as bodily injury.

Plaintiff argues that "there is no authority cited by Defendants supporting the view that a party involved in a car accident, caused by the negligence of a public employee, cannot bring suit for the resulting emotional trauma."  Pl.'s Resp. at 44.  While Plaintiff is correct that Defendants do not cite case law explicitly prohibiting damages for emotional distress resulting from a vehicle accident caused by a negligent public employee, it is Plaintiff's burden to produce facts that fit within an applicable waiver.  Here, the plain language of the waiver

60

statute seems to settle the matter even without resort to case law.  Under the language of the statute immunity has only been waived for damages "resulting from bodily injury, wrongful death or property damage" caused by a negligent public employee.  See NMSA § 41-4-5.  Here, Plaintiff lacks evidence of any of the three requisite forms of damages.

Even looking beyond the plain language of the statute to interpreting case law, the Court finds no indication the New Mexico appellate courts have expanded § 41-4-5 to include Plaintiff's claim.  Plaintiff relies upon two cases in support of her position that a waiver exists for K.G.'s emotional injuries from the bus collision.  Both are inapposite.  First, while the court in *Folz v. State*, 797 P.2d 246 (1990) *did* determine that physical manifestations are not required for a plaintiff to recover for negligent infliction of emotional distress, it also enumerated three "threshold requirements" for recovery for emotional distress:  1) a marital or intimate family relationship between the plaintiff and the victim, 2) severe emotional trauma suffered by the plaintiff as a consequence of contemporaneous sensory perception of the accident, and 3) the victim suffered physical injury or death.  *Id.* at 259.  Plaintiff does not submit evidence to establish any of these requirements; nor does she contend that she can meet these threshold requirements.

Second, in *Brenneman v. Board of Regents of UNM*, 84 P.3d 685 (N.M. Ct. App. 2003), the New Mexico Court of Appeals addressed the availability of loss of consortium damages under § 41-4-9 and § 41-4-10 of the NMTCA, which waive sovereign immunity for damages resulting from bodily injury, wrongful

death or property damage caused by a negligent public employee in the operation of a hospital and in the provision of health care services, respectively. *Brennemen*, 84 P.3d at 686-87.  Considering the plain language of the statute, cases interpreting it, and its legislative history, the court concluded that loss of consortium damages were available when they resulted from bodily injury caused by the negligence of a public employee.  *Id.* at 689.  Thus, the spouse and children of the alleged victim of negligent medical treatment, who sustained bodily injury, were permitted to make claims for loss of consortium under § 41-4-9 and § 41-4-10.  *Id.*  The court noted that loss of consortium is a "'derivative action' . . . defined as 'a [claim] arising from an injury to another person.'"  *Id.* at 687 (quoting Black's Law Dictionary 455 (7th ed. 1999)).

In contrast to *Brenneman*, application of the plain language of the waiver statute to the evidence here dictates the absence of waiver.  While the plaintiffs' damages for loss of consortium in *Brenneman* resulted from the bodily injury of their spouse and mother, Plaintiff has submitted no evidence of bodily injury sustained by K.G. or anyone else at the time of the bus collision.  The plain language of § 41-4-5, like the statutes at issue in *Brennaman*, require that damages result from bodily injury, wrongful death, or property damage.  K.G.'s property was not damaged as a result of the bus collision, and she did not suffer death or bodily injury.  Nor is she in a position to make a claim for loss of consortium damages resulting from the injury of anyone else.  *Brenneman* is of no assistance to Plaintiff here.

Additionally, Plaintiff provides no support for her contention that an inferred "physical jolt" to K.G. suffices as bodily injury under § 41-4-5.

Given that it is not the place of this Court to expand the law of New Mexico beyond the bounds already established by the state courts, *see Proctor & Gamble v. Haugen*, 222 F.3d 1262, 1280 (10th Cir. 2000), the Court has no difficulty determining that immunity has not been waived under § 41-4-5 based upon the present facts and evidence.  As such, Plaintiff's claim that Defendants were negligent in the operation of a vehicle must fail and Defendants are entitled to summary judgment on this one claim.

## V.  CONCLUSION

For the reasons discussed herein, the Court reaches the following conclusions:  1) Plaintiff has presented sufficient evidence to establish a violation by Defendants of the ADA and RA and the availability of compensatory damages; 2) emotional distress damages are available for intentional violations of the ADA and RA; 3) Plaintiff has presented competent evidence of compensatory damages, including for emotional distress; 4) Plaintiff has properly exhausted her administrative remedies for the relevant injuries; 5) a waiver of sovereign immunity exists for K.G.'s hallway injury and playground injury; and 6) no waiver of immunity exists for recovery of damages from the June 2011 bus collision.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (*Doc. 192*) is hereby:

- DENIED as to Plaintiff's claims under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973;

- DENIED as to Plaintiff's claims under the New Mexico Tort Claims Act for K.G.'s hallway injury and playground injury; and

- GRANTED as to Plaintiff's claim under the New Mexico Tort Claims Act for the June 2011 bus collision.


_____
UNITED STATES CHIEF MAGISTRATE JUDGE
Presiding by Consent